LOTTINGER, Judge.
This is a suit for workmen’s compensation for the total and permanent disability of petitioner, Gustave Fontenot. The suit was filed against his employer, the Town of Ville Platte, Louisiana, and its compensation insurer, Traders & General Insurance Company. Subsequent to the filing of the petition, petitioner died, and his surviving wife was substituted as petitioner herein. The Lower Court rendered a judgment in favor of petitioner and the defendants have filed this appeal.
The petition alleges that the then petitioner, Mr. Gustave Fontenot, had worked for the Town of Ville Platte for a period of approximately two years prior to September 7, 1956. While working as a manual laborer in the public park operated by the said town of Ville Platte, petitioner on September 7, 1956, slipped while cleaning the swimming pool and injured the left side of the head and face as well as his left shoulder. He continued working for a period of approximately ten days after which the pains became so severe that he saw his family physician, Dr. R. E. Dupre, who placed him in the hospital at Ville Platte.
The record discloses that Mr. Fontenot remained in the Ville Platte hospital for a period of approximately three months after which he was discharged and returned to his home where he remained for approximately five weeks. Mr. Fontenot was then hospitalized at Charity Hospital in New Orleans for an additional period of approximately five weeks, returned home, and later returned to Charity Hospital, where he died on April 10, 1957. Subsequent to the death, Mrs. Eula Brou Fontenot, the surviving spouse in community with the deceased, filed a petition wherein she claims to be substituted instead of her husband as petitioner and seeks her benefits under the compensation law as surviving dependent spouse, at well as any compensation which may have been due to the deceased.
After trial on the merits, the Lower Court rendered a judgment in favor of the petitioner, Mrs. Fontenot, and against the defendants. The defendants have appealed. Subsequent to the appeal, Mrs. Fontenot has filed a motion wherein she informs the Court of her remarriage on August 27, 1958, and asks that the judgment below be modified to limit the compensation awarded her as surviving widow accordingly-
The record, as a whole, discloses that prior to the date of the accident, during the year 1954, the deceased was operated on by Dr. Edgar Paul Breaux, a general surgeon practicing in Lafayette, Louisiana. At *13 that time, Dr. Breaux removed a hard mass from the left side of the neck of the decedent.
At that time, Dr. Breaux advised the patient that he should return for monthly-checkups, and that radical surgery should be performed to the area for the purpose of removing any malignant tissues. During the month of January, 1955 the decedent was sent to Charity Hospital in New Orleans where he received a prophylactic radical neck dissection, which is a more radical operation than the one performed by Dr. Breaux. Subsequent to this operation at Charity Hospital, the decedent returned home, where he resumed his employment in the city park at Ville Platte. The evidence discloses that periodically during that time he returned to Charity Hospital for checkups.
On or about September 7, 1956, the decedent was engaged in cleaning the swimming pool when the alleged accident occurred. There was algae on the bottom of the pool, and while decedent was using a two-inch hose pipe he slipped and fell on his left side. The evidence discloses that he received a brush burn on the left side of his face on or near the scar which had been caused by the radical surgery.
Although there were a number of people helping to clean the pool, the only eyewitness who testified was the decedent’s brother, Jules Fontenot, who was a member of the City Council of Ville Platte and who was just standing by examining the work which was being performed. Jules Fonte-not testified that upon seeing the deceased fall, a Mr. Wiggins started to go and help him up, but that deceased said that he could get up alone, which he did, and deceased continued working. The decedent continued to do his normal work for a period of ten days, when he was admitted to Dr. Dupre’s hospital on September 17, 1956.
The lay testimony submitted by petitioner was given by Mrs. Fontenot, the substituted petitioner, Mr. O’Neal Fontenot, who was a fellow worker of decedent, and Jules J. Fontenot, the brother of decedent. The sum and substance of this lay testimony is to the effect that deceased did his work well and never complained of pain prior to the accident. None of these parties knew that the decedent had a cancerous condition until after he had died; this includes his wife, who testified that she never did know that he had a cancer and from her testimony, it appears that she did not know that her husband had died from cancer until the time of the trial.
Mr. Burney Daigle, the lay witness who testified by deposition on behalf of plaintiff, stated that he was the superintendent of city park. He testified that the decedent did his work well, however, he did sometimes complain of pain in his stomach, chest or neck, however, Mr. Daigle stated that all the other workers complained of pain at one time or another, and he finally admitted that the other workers complained more than decedent.
Dr. R. E. Dupre, a general practitioner and surgeon, who practices in the town of Ville Platte, was the only medical expert who testified on behalf of petitioner. Dr. Dupre testified that decedent saw him on September 17, 1956, at which time decedent gave him a history of the accident occurring on September 7th. At the time, the only objective symptom which Dr. Dupre found was a brush burn on the left side of the face. He stated that decedent also complained of pains in the neck, left shoulder and left side. Dr. Dupre put decedent in the hospital, as he was running a low grade fever, where decedent remained for approximately eighty days, according to the testimony of Dr. Dupre. During this period of hospitalization, Dr. Dupre testified that X-rays were taken shortly after the admittance of decedent and disclosed that decedent had bronchial pneumonia involving both lungs; that he had “some fluid, a little fluid, suggestive fluid in the left lung, and a little spot of atelectasis in his left lung.” The X-rays were sent to Dr. Roma- *14 gosa for examination. Dr. Dupre stated that while the decedent was hospitalized his complaints were mainly of the chest and arm. He discovered a half-inch lump around the vocal box and while in the hospital the decedent complained of ankylo-sis, which is a fixation of the bone joint resulting in the inability of the patient to open his mouth. Dr. Dupre testified that there was no evidence of malignancy while decedent was a patient in his hospital. Dr. Dupre further testified that in his opinion trauma can aggravate a dormant cancer condition, and he believed that the trauma did shorten decedent’s life a great deal. Shortly after admittance to the hospital, decedent’s fever ran rather high, then subsided, and again went up. At the time of his discharge from the hospital, he had a little bit of fever.
Henry Guillory was the only lay witness who testified on behalf of defendants. Mr. Guillory testified to the effect that he was a coworker of the decedent, however, he was not present at the time of the accident. He further testified that the decedent generally did his work well, however, on occasions he did complain that his arm was hurting and that he was not feeling good. He testified that he would help decedent with his work on certain occasions.
Three medical experts testified on behalf of defendants, namely, Dr. William Lewis Meuleman, a specialist in orthopedics, Dr. Edgar Paul Breaux, a specialist in surgery, and Dr. Jerome J. Romagosa, a specialist in radiology. Dr. Meuleman testified that he examined the decedent on January 9, 1957, at which time decedent gave him a similar history as that related above, however, he stated that the accident had occurred on August 17, 1956. At the time of the examination, Dr. Meuleman testified that the decedent complained that he could not eat properly because of pain in the left side of his head and face, and that because of his inability to eat properly, he had recently lost approximately fifty pounds. He found a very hard mass, about the size of a pecan, over the area of the voice box which was eroded and crusted over. The decedent told Dr. Meuleman that this mass was present prior to the accident, however, it had gotten larger since the accident. Dr. Meuleman stated that he examined the X-rays which had been taken by Dr. Dupre shortly after the admission of the decedent to the Dupre hospital, and that these X-rays showed a malignant condition. At that time, Dr. Meuleman told Dr. Dupre of this condition and further told him that the “patient does not have too much life expectancy.” Dr. Meuleman testified that the condition at the time he examined him, as well as the resultant death of decedent, followed the normal course of events for that particular type of cancer, and that there was no relationship whatsoever between the injury and the subsequent death. Dr. Meuleman stated that the malignant condition existed prior to the date of the accident, and this opinion was based upon his seeing Dr. Dupre’s X-ray which was made almost immediately after the accident. He further testified that the history of the patient from the date of entry into Dr. Dupre’s hospital to the time he left, including the subsequent death, is compatible with a cancerous process. Although Dr. Meuleman testified that cancer can be aggravated, he also testified that this particular injury did not aggravate the cancerous condition of the decedent.
Dr. Edgar Paul Breaux, a general surgeon specializing in surgery, of Lafayette, Louisiana, testified that he first examined the decedent on August 23, 1954. Dr. Breaux stated in his deposition that he found a hard mass on the left neck. The patient was referred to Dr. Breaux by Dr. Dupre, and the patient told Dr. Breaux that he had had this mass on his neck for approximately a month. Dr. Breaux recommended an operation, and said operation was performed by him on September 2, 1954, at which time Dr. Breaux, having found a malignancy, advised decedent of two possible courses, either to do a prophylactic radical neck dissection at that time or wait until a gland appeared and then do *15 a radical neck dissection. The patient returned to Dr. Breaux monthly thereafter until approximately the time that he entered Charity Hospital in New Orleans for the radical surgery. Dr. Breaux testified that at the time he performed the operation, the decedent had a condition known as adenocarcinoma of the neck, which is a malignant disease of the salivary gland involving the glandular tissue of this gland. The five year cure of this disease, according to Dr. Breaux’ opinion, would be less than SO per cent. In January, 1955 a mass appeared at the upper end of the cervical chain, at which time decedent was suffering from headaches and sinus trouble, and the patient went to New Orleans for the radical surgery. Dr. Breaux testified that death with pulmonary metastasis almost three years after the original cancer was discovered is in keeping with the natural history of this type of cancer. He stated further that trauma does not cause the spread of cancer, and would have no relationship with this type of cancer. The spread into the lungs, as shown by the evidence, is normal. Dr. Breaux was of the opinion that the death of Mr. Fontenot was of normal causes and had no relationship to the alleged accident.
Dr. Jerome J. Romagosa was the third medical expert testifying on behalf of defendants. He was a specialist in radiology, and has extensive practice in the interpretation and treatment of cancer. On November 21, 1956, at the request of Dr. Dupre, Dr. Romagosa examined the X-rays which had been taken by Dr. Dupre shortly after the admittance of deceased into Dr. Dupre’s clinic. He stated that he found lesions in the lung, however, at the time he did not know whether they were purely inflammatory or malignant. On January 9, 1957, Dr. Meuleman sent the patient to the witness for X-rays and these X-rays showed that the cancer had spread to the lungs of the patient, mostly in the right lung. The X-rays of Dr. Dupre had shown cancer of the lungs, originating in the salivary gland. Dr. Romagosa testified that the injury had nothing whatsoever to do with the malignant process, and that the process was present for a good period of time. He stated that the injury could aggravate the operative condition but that it would not aggravate the cancerous process. He testified that Dr. Dupre’s X-ray showed that the process was fairly well developed, and that it had been started prior to the time of the alleged accident. Dr. Romagosa stated that regardless of the fall the course of the cancer would have been the same, that it just so happened that the natural course of the disease appeared coincidental with the accident.
So, we have three medical experts being of the firm opinion that the injury or the fall of decedent had nothing to do with the cancerous condition of the decedent. The only conflicting medical testimony is that of Dr. Dupre, who is a general practitioner. The other three doctors who testified are specialists who deal with cancer, and it must be considered that Dr. Breaux, a specialist in surgery, and Dr. Romagosa, a radiologist, are specialists in treating the particular type of cancer from which the decedent was suffering. The rule is that, although the opinions of the patient’s general practitioner must be given great weight, his opinion must yield to the conflicting .opinions of specialists who are testifying in their particular field of practice.
Dr. Meuleman, Dr. Breaux and Dr. Romagosa testified to the effect that the accident would not cause nor would it aggravate the cancerous condition, which was present prior to the time of the alleged accident. It was their opinion that this condition was under way and regardless of whether decedent had an accident or not the normal course of events which followed were .already under way and would have occurred anyhow. The complaints of the decedent at the time he saw Dr: Dupre on the occasion of his admittance to Dr. Dupre’s clinic were normal for the type of cancer of which he was suffering. It certainly appears to us that the decedent *16 received no disabling injuries as a result of the fall. Although the testimony of the lay witnesses are given great weight, the expert medical evidence shows that the history of the decedent, as shown by the evidence as a whole, was natural for a person in his condition.
For the reasons hereinabove assigned, the judgment of the Lower Court will be reversed and there will be judgment herein in favor of defendants and against petitioner, dismissing petitioner’s demand, all costs to be paid by petitioner.
Judgment reversed.